**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| WHOOP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-13578-FDS |
| | ) | |
| SERINITY GROUP (d/b/a AURORA), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**SAYLOR, J.**

This is a trade-dress infringement case. Plaintiff Whoop, Inc., a United States company, alleges that defendant Serinity Group (d/b/a Aurora), a French company, manufactures and sells a health-monitoring device that infringes on its intellectual-property rights. It seeks monetary and injunctive relief under federal law and Mass. Gen. Laws ch. 93A. It has moved for a preliminary injunction barring defendant from selling its allegedly infringing products while this case continues.

For the reasons that follow, the motion will be granted.

## I.   Background

Whoop, Inc., is a U.S.-based technology company that produces the "WHOOP Wearable," a device that "allows consumers to track daily behaviors and metrics like sleep, strain, recovery, and more, to help users optimize their physical and mental performance." (Compl. ¶¶ 5, 17-19). Whoop released the first commercial version of the WHOOP Wearable in 2015. (*Id.* ¶ 20). Although the device has since gone through several iterations, all versions have

included the same "non-functional and distinctive trade dress," consisting of "a continuous fabric band that wraps over the device (i.e., a faceless device) with thin metal accents on the sides of the device." (*Id.* ¶ 21). According to the complaint, "[a]s a result of long and exclusive use, sales, advertising, and third-party recognition," the design of the WHOOP Wearable has become strongly associated with Whoop, Inc. (*Id.* ¶¶ 27, 41).

Serinity Group, doing business as "Aurora," is a manufacturer of health monitoring wearable devices; it is headquartered in France. (*Id.* ¶¶ 6, 42).

In October 2025, Whoop became aware that Aurora was selling what appeared to be a knockoff version of the WHOOP Wearable on its website. (*Id.* ¶ 43). On October 7, 2025, WHOOP sent a letter to Aurora demanding that it cease and desist the sale and manufacture of its knockoff devices, which Whoop alleged infringed on its trade-dress rights. (*Id.* ¶ 49). Aurora did not respond to the letter. (*Id.* ¶ 50).

The complaint was filed on November 25, 2025. On December 9, 2025, Whoop filed a motion seeking to authorize alternative service of process by email under Fed. R. Civ. P. 4(f)(3). (Dkt. No. 15). In its motion, Whoop represented that it had attempted to serve Aurora according to the terms of the Hague Service Convention, by engaging a French bailiff—a type of judicial officer—to serve Aurora at its physical address in Paris listed in the French business registry, in accordance with French domestic law. (Dkt. No. 16 at 2). When the bailiff arrived at the address, however, it became clear that Aurora no longer occupied that office and had left no forwarding address. (*Id.* at 2). Accordingly, Whoop sought leave to serve Aurora via email at the address listed on its website, which the Court granted on April 10, 2026. (Dkt. No. 18). Whoop notified the Court that it had served Aurora via email on April 14, 2026. (Dkt. No. 19).

2

Also on November 25, 2025, Whoop moved for a preliminary injunction, accompanied by several declarations from its executives. (Dkt. Nos. 6-7, 9-12). Defendant did not appear or otherwise oppose the motion. The Court held a hearing on the motion on June 2, 2026, of which defendant received notice.

## II.      Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)). A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs. v. SprintCom Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Id.* at 18.

## III.      Analysis

Although the complaint asserts several claims, including federal and state unfair-competition claims and a claim under Mass. Gen. Laws ch. 93A, plaintiff seeks a preliminary injunction only with regard to its federal trade-dress infringement claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Therefore, the Court will only consider that claim in evaluating the preliminary-injunction factors.

A.    **Likelihood of Success on the Merits**

A trade-dress claim is a species of trademark claim, and "[t]rade dress" is defined as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 37-38 (1st Cir. 2001).

To succeed in a trade-dress infringement action, a party "must demonstrate both that its [trade dress] merits protection and that the allegedly infringing use is likely to result in consumer confusion." *Borinquen Biscuit Corp v. M.V. Trading Corp.*, 443 F.3d 112, 116 (1st Cir. 2006). Plaintiff has shown a likelihood of success as to both counts.

1.    **Protectable Trade Dress**

Plaintiff defines the WHOOP Trade Dress as "a continuous fabric band that wraps over the device (i.e., a faceless device) with thin metal accents on the side of the device."  (Decl. of Brett Tom ¶ 7, Dkt. No. 9).  To be protectable, plaintiff must show that the WHOOP Trade Dress is "used in commerce," "non-functional," and "distinctive," as each of those terms is used in trademark law.  *Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC*, 747 F. Supp. 3d 292, 300 (D. Mass. 2024) (citing *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 35 (1st Cir. 1998)).

a.    **Use in Commerce**

Plaintiff asserts that the WHOOP Trade Dress has been used in commerce since at least 2015.  (*Id.* ¶ 11).  This requirement is therefore satisfied.

b.    **Functionality**

"[T]rademark and trade dress law . . . encourages production of products of high quality 'and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale.'"  *I.P. Lund*

*Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164 (1995)).

"[T]rade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *I.P. Lund*, 163 F.3d at 36 (quoting *Qualitex*, 514 U.S. at 164). In a trade dress infringement action where the trade dress at issue has not been registered with the U.S. Patent and Trademark Office, the party "assert[ing] trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3).

In broad terms, a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Qualitex*, 514 U.S. at 165 (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Stated otherwise, a feature is functional if "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* And even features which perform a "function" in the colloquial sense of that term can still sometimes be nonfunctional for trade dress purposes, such as when they are arranged in some particular arbitrary manner. *See* Restatement (Third) of Unfair Competition § 17 cmt. b (Am. L. Inst. 1995) ("A . . . product feature is not functional merely because the feature serves a utilitarian purpose. The recognition of trademark rights is precluded only when the particular design affords benefits that are not practically available through alternative designs."); *see also I.P. Lund*, 163 F.3d at 37; *Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC*, 747 F. Supp. 3d 292, 302 (D. Mass. 2024) (recognizing that certain shoe elements, where "arranged in an arbitrary manner," could be nonfunctional). An often-cited

list of factors to be considered in determining whether a feature is functional is "(1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product." *CeramTec GmbH v. Coorstek Bioceramics LLC*, 124 F.4th 1358, 1363 (Fed. Cir. 2025) (quoting *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)).

Thus, for example, courts have recognized as functional the overall design of a dental implant, *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 136 (D. Mass. 2003); the ribbed design on top of a hard hat, *Mine Safety Appliances Co. v. Electric Storage Battery Co.*, 405 F.2d 901, 903-04 (C.C.P.A. 1969); and the design of the body of an acoustic guitar, *In re Gibson Guitar Corp.*, 61 U.S.P.Q.2d 1948 (2001). Courts have recognized as nonfunctional, by contrast, the design of a maple syrup bottle, *Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, 2018 WL 4537205, at *12 (D. Mass. Aug. 6, 2018); the "overall design" and certain components of a "stylus holder," *Genesis Strategies, Inc. v. Pitney Bowes, Inc.*, 50 F. Supp. 3d 59, 63-65 (D. Mass. 2014); and the overall shape of a Zippo lighter, *In re Zippo Mfg. Co.*, 50 U.S.P.Q.2d 1852 (1999).

Applying those standards, plaintiff has shown that it is likely to succeed in demonstrating that the WHOOP Trade Dress is nonfunctional following the *Morton-Norwich* factors.

As to "advertising materials in which the originator of the design touts the design's utilitarian advantages," plaintiff has provided its advertising materials and has shown that it relies on "highlighting the recognizable, unique form factor" of its devices in its advertising, not on the "utilitarian advantages" of the design. (Decl. of John Sullivan ¶ 13, Dkt. No. 10). Some

6

materials focus on the "faceless" nature of the device, but plaintiff does not claim that its trade dress encompasses all faceless fitness trackers; it claims only those with "a continuous fabric band that wraps entirely over the device . . . with thin metal accents on the sides of the device." (Br. Supp. Pl.'s Mot. Prelim. Inj. 2; Decl. of Brett Tom ¶ 7).  Finally, there are no facts suggesting that the WHOOP Trade Dress "results in a comparatively simple or cheap method of manufacturing the product."  These factors, therefore, tend to demonstrate that the WHOOP Trade Dress does not "affect[] the cost or quality of the article."  *Qualitex*, 514 U.S. at 165.

Accordingly, plaintiff has shown that the WHOOP Trade Dress is likely nonfunctional.

### c.      **Distinctiveness**

Finally, trade dress must be "distinctive" to be protected under the Lanham Act.  To prevail on a trade dress claim based on a product's design, rather than its packaging, a plaintiff must show that the trade dress has acquired "secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'"  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Lab'ys*, 456 U.S. at 851 n.11 (citation modified)).  In other words, a product's design can never be "inherently distinctive," as can certain word marks and product-packaging trade dress, because "even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing."  *Id.* at 212-14.

Secondary meaning can be shown in several ways.  A plaintiff can introduce "direct evidence probative of secondary meaning," which takes the form of "consumer surveys and testimony by individual consumers" that tends to show that the trade dress functions as a source identifier.  *Yankee Candle*, 259 F.3d at 43.  Plaintiff has introduced no such evidence here.

Alternatively, a plaintiff can prove secondary meaning based on circumstantial evidence, including "[1] the length and manner of the use of the trade dress, [2] the nature and extent of advertising and promotion of the trade dress, . . . [3] the efforts made to promote a conscious connection by the public between the trade dress and the product's source[,] . . . [4] the product's 'established place in the market'[,] and [5] proof of intentional copying." *Id.* at 43-44; *see also Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (recognizing first three factors only). It is well-established that "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Yankee Candle*, 259 F.3d at 43 (quoting *Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 181 (1st Cir. 1993)) (alteration in original).

Beginning with the first factor, the length and manner of the use of the trade dress weighs in plaintiff's favor. The WHOOP Trade Dress has been employed by plaintiff for more than ten years, and it has been central to plaintiff's entire business during that timeframe. (Decl. of John Sullivan ¶¶ 5-7).

The second, third, and fourth factors—the "nature and extent of the advertising and promotion of the trade dress," "the efforts made to promote a conscious connection by the public between the trade dress and the product's source," and "the product's established place in the market"—are related, and each weighs in plaintiff's favor. Plaintiff has provided evidence concerning the extensive advertising efforts it has undertaken, including through television commercials (at least one of which aired during the Super Bowl), social media, and celebrity endorsements. (*Id.* ¶¶ 8-14). Plaintiff has also provided news articles and social-media accounts identifying public figures wearing one of plaintiff's products based on visual identification of the WHOOP Trade Dress from a distance. (*Id.* ¶¶ 15-19).

For those reasons, plaintiff is likely to show that its trade dress is used in commerce, is nonfunctional, and is distinctive.  Therefore, plaintiff is likely to show that its trade dress is eligible for protection under the Lanham Act.

### 2.    Likelihood of Confusion

To prevail on its trade-dress infringement claim, plaintiff must also show that "prospective buyers of the product in question"—here, wearable fitness trackers—"are likely to be confused as to the product's source."  *I.P. Lund*, 163 F.3d at 43.  And the "allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008) (quoting *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996)).  The First Circuit has identified eight factors to be weighed in determining whether consumers are likely to be so confused:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. . . . No one factor is necessarily determinative, but each must be considered.

*I.P. Lund*, 163 F.3d at 43 (quoting *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989).

Starting with the similarity of the marks and goods, defendant's allegedly infringing device is almost identical to plaintiff's device that embodies the WHOOP Trade Dress.  The side-by-side comparison provided in plaintiff's motion demonstrates this clearly:



| Representative Example of WHOOP Product Featuring the WHOOP Trade Dress | Representative Example of Aurora's Infringing Wearable |
|---|---|

(Br. Supp. Pl.'s Mot. Prelim. Inj. 4).

There are some minor differences between the two:  the metal portion of plaintiff's device is thicker than that of defendant's device, and defendant's device appears to include a different buckle mechanism.  But the similarities are unmistakable, and, particularly from a distance, the two devices are virtually indistinguishable.  And the two devices represent themselves as the same good:  wearable fitness trackers.

The next three factors—"the relationship between the parties' channels of trade," "the relationship between the parties' advertising," and "the classes of prospective purchasers"—largely favor plaintiff.  Both parties offer their products for sale on the Internet, showing that they utilize the same channels of trade.  (Decl. of Brett Tom ¶¶ 29-30).  "[T]he relationship between the parties' advertising" depends on how one defines "advertising."  Plaintiff engages in extensive advertising of its product; there is no evidence that defendant engages in any advertising.  (Decl. of John Sullivan ¶¶ 7-12).  But the images on defendant's website—to the extent those can be considered "advertising"—are very similar to plaintiff's advertisements.  (*See, e.g.*, Decl. of Katherine Soule, Ex. 3, Dkt. No. 12-3).  And both companies market their

products to "general consumers." (Decl. of Brett Tom ¶ 28). In sum, then, these three factors tilt somewhat, but not overwhelmingly, in plaintiff's favor.

Next, plaintiff has not provided any evidence concerning "evidence of actual confusion."

As for "the defendant's intent in adopting its mark," the factor is nearly neutral but somewhat favors plaintiff. In its brief, plaintiff asserts that "[u]pon information and belief, [defendant] intentionally copied the WHOOP Trade Dress in order to gain an unfair commercial advantage by mimicking [plaintiff] to confuse consumers and to trade on the goodwill of the iconic WHOOP Trade Dress that [plaintiff] has cultivated over the past decade." (Br. Supp. Pl.'s Mot. Prelim. Inj. 13). But it is well-established that "[t]o carry its burden, a plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings." *Straham v. Roughead*, 2010 WL 4827880, at *10 (D. Mass. Nov. 22, 2010) (quoting *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001)). That said, plaintiff argues that "[t]he nearly identical marketing language, when combined with [defendant's] adoption of the WHOOP Trade Dress and [defendant's] adoption of the same style of photography, as well as some of the actual WHOOP imagery, for its promotional materials, further underscores [defendant's] intent to create an association in the minds of consumers between [plaintiff] and the Infringing Wearables." (Br. Supp. Pl.'s Mot. Prelim. Inj. 13). Given that defendant has not appeared to rebut this circumstantial evidence, this factor tips somewhat in plaintiff's favor.

Finally, "the strength of the plaintiff's mark" favors plaintiff. In evaluating the strength of a mark, courts look to "the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 19 (1st Cir. 2004) (quoting *Star Fin. Servs. v. Aastar Mortg. Corp.*, 89 F.3d 5, 11 (1st Cir. 1996)). All of those factors strongly favor plaintiff. Plaintiff has

used the WHOOP Trade Dress continuously for more than ten years.  (Decl. of Brett Tom ¶ 10).

It has shown some evidence of renown through both industry publications and wider media

coverage.  (Decl. of Brett Tom ¶¶ 15-16; Decl. of John Sullivan ¶ 15).  And it has provided

evidence of its extensive efforts to promote the WHOOP Trade Dress through advertising.  (Decl.

of John Sullivan ¶¶ 8-13).  This factor thus strongly favors plaintiff.

In sum, three factors—"the similarity of the marks," "the similarity of the goods," and

"the strength of the plaintiff's mark"—strongly favor plaintiff, and the First Circuit has noted

that "where the parties are direct competitors, the most important factor in the [likelihood-of-

confusion] analysis is the similarity-of-marks inquiry."  *Boston Duck Tours*, 531 F.3d at 26.  Four

more factors—"the relationship between the parties' channels of trade," "the relationship

between the parties' advertising," "the classes of prospective purchasers," and "defendant's intent

in adopting its mark"—tilt somewhat, but not overwhelmingly, in plaintiff's favor.  No factors

favor the defendant.  Under the circumstances, plaintiff has established it is likely to succeed in

showing a likelihood of consumer confusion.

For the foregoing reasons, plaintiff has shown that it is likely to succeed on the merits of

its trademark infringement claim, because it is likely to show both that the WHOOP Trade Dress

is protectable and that defendant has infringed on that trade dress.

> **B.      Immediate Threat of Irreparable Harm**

Irreparable harm is measured "on a sliding scale, working in conjunction with a moving

party's likelihood of success on the merits, such that [t]he strength of the showing necessary on

irreparable harm depends in part on the degree of likelihood of success shown."  *Braintree Labs.,*

*Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotations and

citations omitted).  And "[b]ecause adequate legal remedies foreclose injunctive relief, [a

plaintiff] cannot demonstrate irreparable harm without showing that they have inadequate remedies at law." *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7-8 (1st Cir. 2021).

Section 1116(a) of Title 15 provides that "[a] plaintiff seeking" an injunction to prevent a violation of section 43(a) of the Lanham Act "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a motion for a preliminary injunction." 15 U.S.C. § 1116(a). Accordingly, plaintiff has satisfied this second factor.

### C.    Balance of Equities

The balance of equities also favors plaintiff. In weighing the balance of equities, "it is generally true that the harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms. The Court is to consider the potential legitimate harm to the defendants owing to the injunction as balanced against the degree of plaintiff's likelihood of success on the merits." *Public Impact*, 169 F. Supp. 3d at 296 (quoting *Friz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 97-98 (D. Mass. 1996)). Plaintiff has invested substantial time and resources over a decade into developing products that employed the WHOOP Trade Dress. (Br. Supp. Pl.'s Mot. Prelim. Inj. 17). And although defendant has identified some harms that would flow from the issuance of a preliminary injunction, including the potential destruction of some of its inventory held by Amazon, the Court finds that the demonstrated harms to plaintiff, when considered along with plaintiff's strong showing of likelihood of success on the merits, outweigh any such harms to defendant.

### D.    Public Interest

Finally, the public interest weighs in plaintiff's favor. Courts have recognized that the "public interest favors protecting against further violation of federal . . . trademark laws." *Lifted Rsch. Grp., Inc. v. Behdad, Inc.*, 591 F. Supp. 2d 3, 8 (D.D.C. 2008); *see Commerce Bank &*

13

*Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 88 (D. Mass. 2008) ("In trademark cases, the public interest almost always favors the granting of otherwise appropriate injunctions." (internal quotation omitted)).  Therefore, this favor favors plaintiff as well.

### E.      **Injunction Bond**

Under Federal Rule of Civil Procedure 65(c), a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Because defendant has not appeared, the Court has no information concerning the value of the harms defendant would incur if a preliminary injunction is issued.  Accordingly, the Court will require plaintiff to post only a nominal injunction bond of $1.

### IV.     **Conclusion**

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. The Court will enter a separate preliminary injunction order.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  June 3, 2026                    United States District Judge

14